## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE FEW, THE PROUD, THE FORGOTTEN; VIETNAM VETERANS OF AMERICA; and CONNECTICUT STATE COUNCIL OF VIETNAM VETERANS OF AMERICA, | No. 3:16-cv-00647 (VAB) |
| *Plaintiffs*, | |
| v. | May 17, 2019 |
| UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | |
| *Defendant*. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR CIVIL CONTEMPT

For two-and-a-half decades between 1953 and 1987, around one million Marines, sailors, civilian employees, and military family members stationed at Camp Lejeune unwittingly drank, cooked with, and bathed in poisoned water supplying the base. The chemicals in the water caused serious life-threatening illnesses, including bladder cancer, leukemia, kidney cancer, and liver cancer. Thousands of veterans exposed to these toxins have been trying for decades to obtain benefits from the Department of Veterans Affairs (VA), which is required by law to provide disability benefits to veterans for injuries or disabilities incurred in military service.

In response, the VA established the Subject Matter Expert (SME) program to evaluate Camp Lejeune claims. Meant to lend expertise, legitimacy, and consistency to these adjudications, the SME program has instead continuously been marred by questions about the SMEs' qualifications, competence, and integrity. Plaintiffs brought this Freedom of Information Act (FOIA) suit to shed light on the reality of this program and the individuals responsible for its implementation.

1

After years of litigation over Plaintiffs' request, the VA has still failed to produce records sufficient to satisfy this pressing public interest. As SMEs continue to make crucial decisions in Camp Lejeune cases, these purported experts' identities and full backgrounds remain unknown to the veterans whose livelihoods are at stake. And the limited disclosures about SMEs' professional backgrounds that the VA has produced so far are insufficient to assess the propriety of their influence in the process. Because the public interest in making this assessment far outweighs the privacy interests on the other side, Plaintiffs ask this Court to grant them summary judgment and order the un-redaction of SMEs' names on the emails and resumes already produced. Alternatively, if this Court prefers to order the un-redaction through a finding of civil contempt, Plaintiffs would be amenable to that relief as well.

## RELEVANT FACTS AND PROCEEDINGS

In 2012, the VA established the SME program to respond to the Camp Lejeune water contamination crisis. SMEs are VA employees located throughout the country who review medical records and issue opinions on the medical nexus between veterans' claimed conditions and their exposure to contaminated water at Camp Lejeune. Def.'s Answer ¶ 10, ECF No. 18. SMEs' opinions have "significant influence" over the adjudication of benefits claims. *Id.* ¶ 12. Despite this purported expertise, many concerns have arisen about the SMEs' qualifications. News reports revealed instances of SMEs copying from Wikipedia and lacking necessary medical qualifications. Compl. ¶¶ 14-18, ECF No. 1. Concerningly, from May 2012 to July 2016, the grant rate for Camp Lejeune claims was under 5%, dropping from 25% before the SME program began. *Compare* Ex. 3 to Def.'s Local Rule 56(a)(1) Statement at 31, ECF No. 26-2, *with* Def.'s Answer ¶ 13.

On December 7, 2015, Plaintiffs submitted a FOIA request to the Veterans Health Administration (VHA) and the Veterans Benefits Administration (VBA) seeking documents about the SME program, including documents related to the qualifications of the individuals employed

as SMEs. *See* Ex. A to Compl., ECF No. 1. After VHA and VBA failed to provide any responsive documents, Plaintiffs filed this action against the VA on April 27, 2016.

VBA and VHA produced some responsive documents in the fall of 2016. Despite Plaintiffs' objections to the VA's inadequate search, the VA subsequently moved for partial summary judgment in December 2016. Def.'s Mot. for Partial Summ. J., ECF No. 26. Plaintiffs argued that both VBA and VHA had conducted inadequate searches and had improperly redacted names of the SMEs under FOIA's personal privacy exemption, 5 U.S.C. § 552(b)(6). Pls.' Resp., ECF No. 31. On May 26, 2017, this Court denied in large part the VA's motion, finding that the VA had not completed a reasonable search for records responsive to the majority of Plaintiffs' FOIA request. Ruling on Def.'s Mot. for Partial Summ. J., ECF No. 39. This Court also "agree[d] with Plaintiffs" that the VA failed to carry its burden to prove that Exemption 6 applied to the redacted records given the public interest in knowing whether the SMEs were properly qualified. *Id.* at 25. But because the VA "alluded to the possibility of producing additional records that would establish SMEs' qualifications," this Court did "not address whether Exemption 6 would permit redaction of the SMEs' names" in its May 2017 ruling. *Id.* at 29. The Court ordered the VA to produce additional responsive documents within thirty days. *Id.* at 31.

After further failures by the VA to produce adequate records and meet court-ordered deadlines in July 2017 and January 2018, *see, e.g.*, ECF Nos. 68, 76, 87, the Court ultimately set a final deadline on document production for January 11, 2019, *see* Order at 2, ECF No. 98. The VA met that deadline, completing production in January 2019 and providing Vaughn indices in February 2019. *See* Pls.' Mot. to Reschedule Jan. Status Conference at 2, ECF No. 141. At plaintiffs' request after review of the Vaughn indices, Defendant produced updated Vaughn indices on March 5 and April 15, 2019.  Pls.' Status Report, ECF No. 146.

3

This Court held a status conference on April 25, 2019, during which the parties discussed the few remaining issues to be resolved and a briefing schedule on which to do so. *See* ECF No. 144. The Court then issued an order directing Plaintiffs to address the issue of contempt. ECF No. 145. Plaintiffs filed a status report on May 3, 2019. ECF No. 146.

## ARGUMENT

### I.  Standard of Review

#### A.  Summary Judgment Standard

Summary judgment is appropriate when the nonmoving party demonstrates that there is no genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When determining whether there is a genuine issue of material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But to survive a motion for summary judgment, the nonmovant must do more than present evidence that is merely conclusory or speculative. *Id.* Factual disputes will not necessarily defeat a motion of summary judgment unless those factual disputes are material to the issues before the court. *Id.* at 248.

#### B.  FOIA Exemption 6 Standard

Congress enacted the Freedom of Information Act "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). FOIA thus "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies," *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). Although FOIA contains some exemptions from disclosure, "these limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. Exemptions to FOIA's broad disclosure mandate are therefore construed narrowly, *see Dep't of Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 8

4

(2001); *Halpern*, 181 F.3d at 287, and "[t]he government bears the burden of establishing that any claimed exemption applies," *Wood v. FBI*, 432 F.3d 78, 83 (2d Cir. 2005).

Here, the VA redacted the SME names under FOIA's Exemption 6, which permits the government to shield from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Courts in this Circuit assess whether Exemption 6 authorizes nondisclosure under the two-step test set out in *Wood v. FBI*. First, the government must show that "the records at issue are likely to contain the type of personal information that would be in a medical or personnel file," such as "place of birth, date of birth, date of marriage, employment history, and comparable data." *Wood*, 432 F.2d at 86 & n.3.

Second, if the records are likely to contain such information and that information implicates greater than *de minimis* privacy interests, *see Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012), the Court must balance those interests against the public interest in disclosure, *see Wood*, 432 F.2d at 86. Because Exemption 6 protects only against "clearly unwarranted" invasions of privacy, the exemption requires courts to balance the "individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act—to open agency action to the light of 'public scrutiny,'" *Rose*, 425 U.S. at 372 (citations omitted). And, in accord with FOIA's animating principles, courts ought to "tilt the balance in favor of disclosure." *Getman v. NLRB*, 450 F.2d 670, 674 n.11 (D.C. Cir. 1971). In carrying out this weighing, courts often consider the following five factors:

> (1) [T]he government employee's rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature.

*Perlman v. Dep't of Justice*, 312 F. 3d 100, 107 (2d Cir. 2002), *vacated by* 541 U.S. 970 (2004), *reaff'd*, 380 F.3d 110 (2d Cir. 2004); *Wood*, 432 F.2d at 88-89. These factors are not exhaustive, and no one factor is dispositive. *Id.*

## II.     Summary judgment is an appropriate vehicle for ordering the Government to produce SME names

Plaintiffs respectfully submit that summary judgment is an appropriate remedy rather than civil contempt, but if the Court determines that a civil contempt decision is more efficient for the resolution of this case, Plaintiffs are amenable to that relief. In its April 26, 2019 order, the Court ordered that, "[t]o the extent the discovery provided resulted in redactions not already contemplated by the Court's previous summary judgment ruling, these issues also can and should be similarly addressed through a renewed motion for civil contempt." ECF No. 145 at 2.  Civil contempt, however, is generally only available if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).

In its decision on summary judgment, the Court did not conclusively determine whether SME names could remain redacted "[b]ecause Defendant represented at oral argument that it will produce additional records in response to Plaintiffs' inquiry about the qualifications of the SMEs." ECF No. 39 at 29. Plaintiffs agree that Defendant did indeed produce additional records, but, as explained below, those additional records remain insufficient to evaluate SME qualifications and are inappropriate under FOIA Exemption 6. Because Defendant's redactions are inappropriately broad and have been applied to routine emails that are not within the scope of exemption 6 at all, the failure to comply with the law is clear, unambiguous, and convincing. However, because

6

Defendant's redactions involve documents that the Court has not previously contemplated or redactions the Court has not specifically ordered Defendant to undo, plaintiffs believe summary judgment is an appropriate remedy.

In addition, it was appropriate for Plaintiffs for wait until the Defendant's production was complete and Plaintiffs could assess Defendant's justifications for additional redactions in emails and other documents before raising redaction issues with the Court. Defendant redacted thousands of documents under a variety of FOIA exemptions, and Plaintiffs could not make a full assessment of which, if any, redactions were inappropriate until receiving and reviewing the Vaughn indices. Plaintiffs did not complete their review until April, and promptly sought to challenge a single category of redactions: SME names redacted under FOIA exemption 6.

### III.    The Government should produce documents without redacting SME names.

The Exemption 6 redactions of SME names on emails in this case fail at both steps of the *Woods* inquiry. First, the mundane, intra-office e-mails at issue here are not medical, personnel, or similar files and therefore receive no protection under Exemption 6. *See, e.g.*, Ex. H to Ex. 1 (Garg Decl.) to Pl.'s Local Rule 56(a)(1) Statement (containing a sample of representative internal emails containing extensive Exemption 6 redactions). Second, the public's need for the redacted names on both the emails and the SME resumes far outweighs the individual privacy interests in keeping those names secret. The Court should therefore order Defendant to produce these documents without the SME names redacted.

### A.    Exemption 6 does not apply to routine emails because they are not "similar" to personnel and medical files.

The emails at issue here are not personnel, medical or similar files and therefore are not covered by Exemption 6. The Supreme Court cautions that Exemption 6 was "intended to cover detailed Government records on an individual which can be identified as applying to that

individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595 (1982). As courts in this circuit have recognized, "mundane interoffice communications that do not contain any detailed personal information"—like those that the VA has produced here—"can in no way be construed as similar to personnel or medical files." *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 301 (S.D.N.Y. 2011); *see Cook v. Nat'l Archives & Records Admin.*, 921 F. Supp. 2d 148, 155 (S.D.N.Y. 2013) ("[I]nter-agency emails—even ones that included the sender's name, position, department, and phone number—are not 'similar files' entitled to protection under Exemption 6."), *aff'd*, 758 F.3d 168 (2d Cir. 2014); *see also Friedman v. U.S. Secret Serv.*, 923 F. Supp. 2d 262, 282 (D.D.C. 2013) (holding that the "names of government employees" and correspondence that identifies them are not ordinarily considered a "similar file" under Exemption 6); *Aguirre v. SEC*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008) ("Correspondence does not become personal solely because it identifies government employees.").

In its January 2019 FOIA response, the VA applied Exemption 6 to names of all SMEs and other VA employees that Plaintiffs did not specifically name in their FOIA request. These emails, ranging from meeting-scheduling conversations to concerns about the SME program, are nothing close to the "detailed Government record[s]" that Exemption 6 is meant to protect. *Wash. Post*, 456 U.S. at 602. Rather, they are exactly the kind of mundane, inter-agency emails that courts routinely find fall outside the exemption's ambit. Therefore, these emails do not qualify for Exemption 6 protection, and the names should be unredacted from them.

B.      **Disclosure of SME names in the emails and on the resumes is not a clearly unwarranted invasion of personal privacy under Exemption 6.**

Even assuming that the SMEs' names contained in the emails and other documents already disclosed qualify as "similar files," the privacy interest in keeping those names a secret is outweighed by the public interest that would be served by disclosure.

8

The public has a profound interest in the identities of the SMEs because the functioning of the program in question is entirely dependent upon these individuals' unique expertise in fields related to toxic exposure. SMEs draw upon their purported medical expertise, subject-matter training, and epidemiological background to review the veterans' claims and issue an opinion, which is often outcome-determinative. Yet, even after the government's significant productions in this case there is reason to question that expertise, which only the names of the SMEs will resolve.

The VA's disclosure of the SMEs' qualifications like resumes, severed from their names, has proven insufficient to satisfy the public's substantial interest in shedding light on the propriety of these purported experts' influence on Camp Lejeune veterans' claims. Until the VA completed its productions, Plaintiffs did not know whether the redacted documents would suffice to establish the SMEs' qualifications. At oral argument on Defendant's motion for partial summary judgment in 2017, counsel for Plaintiffs discussed how the slim production at that point made it difficult to assess whether redacted documents would be adequate to satisfy the public interest at issue. *See* Tr. at 47:1-48:18. In seeking unredacted names at that point, rather than waiting to see what else the Defendant might produce, counsel also identified the potential for delay that attended a multi-step process. *See id.*

Now that the productions are complete, and given subsequent information that has come to light regarding the SMEs, it has become clear that Defendant failed to produce records sufficient to establish the qualifications of the SMEs and so redactions of their names is unwarranted. This disclosure provides only a curated, self-serving portrait of the SMEs' professional backgrounds. It therefore does not provide the information at the heart of the public interest advanced by this FOIA request: understanding whether these individuals are truly qualified to bear the weighty responsibilities with which they have been entrusted. Only by learning the SMEs' identities can

the public access aspects of their background that call into question their qualifications—information that is not found in their resumes but is suggested by a growing body of publicly available information calling SME qualifications and integrity into question. Because this public interest cannot be satisfied without the disclosure of the SME names and is not outweighed by any "clearly unwarranted invasion of privacy," 5 U.S.C. § 552(b)(6), the VA should un-redact the SME names on the e-mails and resumes that have been disclosed.

Although the SMEs might possess *some* privacy interest in their names alone, *see Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 176 (2d Cir. 2014), each of the factors that the Second Circuit has set out for guiding the balancing of these competing interests counsels disclosure here, *see Perlman*, 312 F.3d at 107; *Wood*, 432 F.2d at 88-89.

First, the SMEs' rank favors disclosure. *Id.* Their judgments have "significant influence" in determining Camp Lejeune veterans' access to benefits. Def.'s Answer ¶ 12. In every one of the thousands of cases decided each year, *see* Ex. 2 to Pl.'s Local Rule 56(a)(1) Statement, VBA Response to FOIA Request at 6 (Aug. 31, 2016), VA claims adjudicators have been instructed to "make[] the grant or denial decision in accordance with the SME opinion," Ex. 3 to Pl.'s Local Rule 56(a)(1) Statement, E-mail from Robert E. Clay (Sept. 18, 2014, 9:16 AM EST). Serving as the de facto arbiters of thousands of veterans' claims each year, the SMEs' exercise of substantial authority evinces their treatment as high-ranking employees within the VA and therefore weighs in favor of disclosure. *See Seife v. Nat'l Inst. of Health*, 874 F. Supp. 2d 248, 258 (S.D.N.Y. 2012).

Second, there is strong evidence of a significant "degree of wrongdoing" on the part of SMEs—evidence that has continued to amass over the course of this litigation. *Perlman*, 312 F.3d at 107. In balancing the public interest and the individual privacy interest under the more stringent Exemption 7(C), the Supreme Court requires the request to "produce evidence that would warrant

a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat'l Archives & Records Admin v. Favish*, 541 U.S. 157, 174 (2004).

Here, significant evidence of wrongdoing warrants a reasonable belief of impropriety on the part of some SMEs. Two separate media outlets reported on wrongdoing by Dr. Gary Wilhelm, an SME named in Plaintiffs' FOIA request, FOIA Request at 5. The first media outlet, based in Florida, noted that Dr. Wilhelm stood accused of preparing reports for which he does not have the competence to provide and that he merely copied information from websites in his opinions. *See* Ex. A to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.). That article also referenced a federal lawsuit involving Dr. Wilhelm which revealed that teaching staff at the William Beaumont Army Medical Center "believed that [Dr. Wilhelm] was inept in the operation room" and that Dr. Wilhelm had "inadequate performance in the cognitive and psychomotor domains." *See Wilhelm v. Caldera*, 90 F. Supp. 2d 3, 4 (D.D.C. 2000) (internal quotations omitted). A separate media outlet based in Minnesota reported that Dr. Wilhelm was the Director of Compensation and Pension at the Minneapolis VA, during a time when unqualified VA staffers conducted as many as 300 traumatic brain injury (TBI) examinations in connection with VA benefits, possibly resulting in erroneous denials of benefits. *see* Ex. B to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.); *see also see* Ex. C to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.) (writing about the investigation into Dr. Wilhelm and accusing him of "willfully not following" VA policies). Medical analysis conducted by unqualified doctors leading to denial of benefits is exactly the kind of wrongdoing Plaintiffs seek to protect veterans from.

Another SME, Dr. Wanda Blaylark stands, accused of diagnosing a veteran as not having TBI without conducting any "neuropsychological testing." Ex. D to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.). In response to wrongdoing on the part of Dr. Blaylark and under

the supervision of Dr. Wilhelm, the VA Secretary granted equitable relief to more than 24,000 veterans following a nationwide review of TBI medical examinations conducted between 2007 and 2015. *See* Ex. E to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.).

Access to SME names has also permitted individuals to uncover criminal convictions of two SMEs, and in one of those situations, evidence of medical board disciplinary action against an SME. A media outlet in Tampa, Florida reported that an SME, Dr. Sheila Mohammed, was convicted of tax fraud in 2018. *See* Ex. F to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.). Dr. Koopmeiners, *see* FOIA Request at 5, faced disciplinary action by the Minnesota Board of Medical Practice following a guilty plea and sentencing for one count of criminal sexual conduct in the first degree, *see* Ex. G to Ex. 1 to Pl.'s Local Rule 56(a)(1) Statement (Garg Decl.). These incidents demonstrate that there is a significant risk that SMEs have continued to wield significant influence over Camp Lejeune veterans' claims despite their lack of professional and ethical qualifications. With doctors like Dr. Wilhelm, Dr. Blaylark, Dr. Mohammed, and Dr. Koopmeiners involved in the SME program, no reasonable person can deny that government wrongdoing may occur.

The third *Perlman* factor—whether there are other ways to access the information—also favors disclosure. *Perlman*, 312 F.3d at 107. This factor weighs in favor of disclosure where the government has "exclusive access" to the information sought. *Id.* at 107-108. Here, the VA, as the employer of SMEs, has exclusive access to the complete list of SME names.

Fourth, the disclosure of the SMEs' names would shed substantial light on a government activity. The government is operating a program that denies thousands of veterans disability benefits each year and justifies these denials with the "expert" opinions of these SMEs. Ex. 2 to Pl.'s Local Rule 56(a)(1) Statement, VBA Response to FOIA Request at 6 (Aug. 31, 2016); Ex. 3

12

to Pl.'s Local Rule 56(a)(1) Statement, Email from Robert E. Clay (Sept. 18, 2014, 09:16AM EST). Knowing who those people are—not just what background they choose to put on their resumes—is at the heart of knowing whether this program contributes to the accurate adjudication of these claims or whether it merely adds another bureaucratic vehicle by which to slow or deny veterans access to benefits.

Finally, the fifth *Perlman* factor—whether the disclosure is related to the employees' job function—weighs in favor of disclosure. Indeed, the *sole* purpose of these disclosures is to shed light on the SMEs' job functions. Because Plaintiffs' seek the SMEs' names in order to assess their fitness for the positions at the VA that they occupy, and because the only way to know whether aspects of the SMEs' backgrounds call this fitness into question is by learning who these individuals actually are, the SME names relate directly to the employees' job function.

Thus, the *Perlman* factors all favor disclosure of the SME names. That settles this matter.

In addition, the Second Circuit's holding in *Long v. Office of Personnel Management*— that the plaintiffs were not entitled to 800,000 federal employees' names and duty stations—does not compel a contrary result. *Long v. Office of Pers. Mgmt.*, 692 F.3d 185 (2d Cir. 2012). First, the privacy interest at stake in *Long* was weightier than here. In making its highly "context specific" determination that *some* employees in *Long* possessed a privacy interest in the disclosure of their names, the Second Circuit relied heavily on the fact that the employees whose information merited protection were engaged in highly sensitive "national security, homeland security, or law enforcement" activities that caused them to "face an increased risk of harassment or attack." *Id.* at 191-92. Meanwhile, the Office of Personnel Management (OPM) appears not to have even attempted to withhold the names and other information of employees at the many agencies not deemed "sensitive." *See id.* at 189 & n.4 (not including the VA). Further, OPM's nondisclosure of

13

the employee names was justified as a part of the "many security measures instituted after the attack on the Pentagon on September 11th" meant to protect employees from attack. *Id.*

Here, on the other hand, the SMEs are neither involved in similarly "sensitive occupations" nor in positions that make them "particularly 'vulnerable to harassment or attack.'" *Adelante Ala. Worker Ctr. v. U.S. Dep't of Homeland Sec.*, No. 1:17-CV-9557-GHW, 2019 WL 1380334, at *15 (S.D.N.Y. Mar. 26, 2019) (quoting *Long*, 692 F.3d at 192) (finding immigration experts' privacy interests in their names to be *de minimis* because "[t]he[] mere possibility that the release of information could potentially lead to harassment [was] not evidence of a 'real' threat of harassment"). Like with the purported experts in the more recent *Adelante* case, *id.* at *15, the risks of harassment or attack for the VA's SMEs are at this point entirely speculative, and therefore noncognizable under Exemption 6.

Second, the public interest that would be advanced by disclosure here is far more important than that put forward in *Long*. In *Long*, the Second Circuit was skeptical of the Plaintiffs' broad assertion that "names and duty-station information of over 800,000 federal employees" were necessary because "[g]overnment work is done by people." *Long*, 692 F.3d at 188, 193. Here, by contrast, Plaintiffs are requesting names of approximately 52 employees and have identified why these particular employees' identities are highly salient to understanding the operations of this specific government program.

The SME program is premised on these individuals' purported expertise, qualifications, and competence. Yet, there are serious reasons to doubt whether the individuals in the SME roles in fact possess those qualities. The only way to determine whether they do—and therefore whether the SME program is in fact fulfilling the functions that it is supposed to—is by learning who the SMEs are. As the Southern District of New York recently recognized in a case involving

14

immigration subject-matter experts in the Department of Homeland Security (DHS), "the public has a real interest in understanding whose judgment is being employed by the [DHS] and whether those contractors are qualified for the job." *Adelante*, 2019 WL 1380334, at *16. Just like here, "the identity of the Experts and their professional backgrounds are relevant to evaluating the [agency's] functionality, as well as how [it] is spending taxpayer funds," and "disclosure here would further the 'core purpose of the FOIA.'" *Id.* (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)).

The Court should therefore order un-redaction of the SME names.

## CONCLUSION

For these reasons, Plaintiffs request that the Court grant summary judgment in their favor and order the Defendant to remove the redactions of the SME names on the resumes and emails. In the alternative, if the Court prefers to order the un-redaction through a finding of civil contempt, Plaintiffs would accept that result as well.

Date:   May 17, 2019
       New Haven, CT

Respectfully submitted,

/s/ Renée Burbank
Renée Burbank (ct30669)
Shikha Garg, Law Student Intern
Corey Meyer, Law Student Intern
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
Fax: (203) 432-1426
renee.burbank@ylsclinics.org
  *Counsel for Plaintiffs*